Filed 8/13/15  In re Kyle V. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re KYLE V., a Person Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> AMANDA S., <br><br> Defendant and Appellant. | F070666 <br><br> (Super. Ct. No. JD130370-00) <br><br> **OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Louie L. Vega, Judge.

Catherine C. Czar, under appointment by the Court of Appeal, for Defendant and Appellant.

Theresa A. Goldner, County Counsel, and Elizabeth M. Giesick, Deputy County Counsel, for Plaintiff and Respondent.

ooOoo-

Amanda S. (mother) appeals from an order terminating parental rights to her child Kyle V. with adoption selected as the permanent plan. (Welf. & Inst. Code,[1] § 366.26.) She contends the order must be reversed because the juvenile court failed to comply with the notice requirements of the Indian Child Welfare Act (ICWA) (25 U.S.C.§ 1901 et seq.) and because the juvenile court failed to order legal guardianship with relative caretakers instead of adoption for Kyle. We conditionally reverse and remand for the limited purpose of compliance with ICWA.

### FACTS AND PROCEDURAL HISTORY

In March of 2013, the Kern County Department of Human Services (department) alleged that one-year-old Kyle V. came within the provisions of section 300, subdivisions (b) and (g), due to mother's and father's substance abuse and incarceration. At the detention hearing, mother stated she had no Indian heritage. Father claimed to have Inuit heritage, and the juvenile court ordered ICWA notices to be sent. Kyle was initially placed in nonrelative foster care and, on April 5, 2013, was placed with mother's brother, Roger B., and his wife, Adrian B.

At jurisdiction/disposition on May 24, 2013, mother and father submitted on the social worker's report; the section 300, subdivision (b), allegations were found true; and the subdivision (g) allegations were dismissed. The juvenile court found that proper ICWA notice had been given. Kyle was removed from parental custody and reunification services were provided to mother and father.

On June 10, 2013, pursuant to a request for an ex parte finding, the juvenile court found that proper ICWA notice had been given, no determinative evidence had been received within 60 days of proper notice, and Kyle was not subject to ICWA unless further evidence of ICWA applicability was received.

---

[1]All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

At the six-month review hearing on November 22, 2103, the juvenile court found that mother was making acceptable efforts to comply with services and continued services for her. Services for father were terminated.

At the 12-month review hearing May 22, 2014, the juvenile court found that mother made only minimal efforts to comply with reunification and made no progress toward alleviating or mitigating the causes for Kyle's out-of-home placement. Services for mother were terminated, and a section 366.26 termination hearing was set for September 19, 2014. Mother was advised of her writ remedy.

On September 10, 2014, mother filed a section 388 petition (form JV-180) requesting reinstatement of reunification services or placement of Kyle with mother, with family maintenance services.

At the combined section 388 and section 366.26 hearing on September 19, 2014, mother testified that she had stopped using illegal substances; was making efforts to resolve her substance-abuse issues; and that she had completed residential treatment, had a place to live, was enrolled in outpatient treatment, was continuing with counseling and parenting classes, had been regularly visiting Kyle, had a good relationship with him, and believed she was in a position to safely care for him.

The juvenile court denied mother's section 388 petition, finding that she had not met her burden to show changed circumstances or that the requested change was in the child's best interest.

As to the section 366.26 issues, Roger B. testified that he would prefer legal guardianship to adoption as the permanent plan for Kyle because he preferred to see mother reunify with her child. The hearing was continued in order to allow the parties to brief the relative-caretaker-exception-to-adoption issue and to investigate Roger B.'s preferences.

At the continued section 366.26 hearing on October 14, 2014, the juvenile court found that, based on the briefing and updated supplemental report, Roger B. was now

committed to adopting Kyle. The juvenile court made a renewed finding that ICWA did not apply. It then found that Kyle was likely to be adopted and that a permanent plan of adoption by Roger B. and his wife, who were fit and willing relatives, was an appropriate permanent plan. Mother's and father's paternal rights were terminated.

Mother appeals from the termination order made on October 14, 2104.

## *DISCUSSION*

### I.      *ICWA notice requirements*

Mother contends first that the termination order must be reversed because the department and juvenile court failed to comply with the notice requirements of ICWA. We agree.

#### A.      *Procedural ICWA background*

At the March 15, 2013, detention hearing, the juvenile court stated that the court received a Parental Notification of Indian Status form (ICWA-020) from father claiming "Inuit heritage, Alaskan Native American," to which father replied, "Yes, sir." On the ICWA-020 father checked the box stating, "I may have Indian ancestry" and wrote "Inuit" next to it.

The Notice of Child Custody Proceeding for Indian Child form (ICWA-030) completed by the department stated that father had Choctaw, Comanche, Cherokee, and Inuit heritage. Information for father's mother included her address, birthdate, and birth place, and that she had Cherokee and Comanche heritage. For father's father, it included his address, birthdate, and birth place; that he had Inuit and Choctaw heritage; and provided his Inuit tribal membership number.

Father's maternal grandmother's information included her address, birthdate, and birth place, and that she had Cherokee heritage; his maternal grandfather's information included his address, birthdate, and birthplace, and that he had Comanche heritage. Father's paternal grandmother's information included her name, that she was deceased,

4.

her state of birth, and that she had Inuit heritage; father's paternal grandfather's information included his name, current city, and that he had Choctaw heritage.

Additional information provided snippets of information about one of father's great-great-grandfathers, two of his great-great-grandmothers, and one of his great-great-great-grandmothers and great-great-great-grandfathers. All either had Comanche or Cherokee heritage.

On April 1, 2013, the ICWA notice, with all of the above-referenced information, was formally sent to the Bureau of Indian Affairs (BIA) Pacific Regional Office; the Secretary of the Interior; the Eastern Band of Cherokee Indians; the Mississippi Band of Choctaw Indians; the Jena Band of Choctaw Indians; the Comanche Nation—Oklahoma; the Cherokee Nation of Oklahoma; the United Keetowah Band of Cherokee Indians; and the Choctaw Nation of Oklahoma. Mother and father were also noticed.

During the month of April 2013, letters were received from the Mississippi Band of Choctaw Indians, the United Keetowah Band of Cherokee Indians, the Cherokee Nation, the Comanche Nation, and the Choctaw Nation of Oklahoma stating they were unable to establish Indian heritage for Kyle. The BIA's response, dated April 15, 2013, and signed by the superintendent, stated that the BIA did not determine tribal eligibility or maintain a comprehensive list of persons possessing Indian blood and checked the box stating, "You've established child's Tribal information; please refer notice to the Tribe."

On May 7, 2013, ICWA notice was again sent to the BIA Pacific Regional Office, the Secretary of the Interior, and the Eastern Band of Cherokee Indians. The BIA responded again on May 16, 2013, with the same letter it sent originally, this time signed by the Deputy Director of Indian Services.

The May 24, 2013, report prepared in anticipation of disposition stated that father claimed American Indian heritage "and initially reported he was a descendent of the Inuit tribe of Alaska. After further information it was determined the Indian heritage may be descendent from Inuit and Choctaw."

5.

At jurisdiction on May 24, 2013, mother and father submitted on the social worker's report. The juvenile court found that proper ICWA notice had been given to the BIA, Secretary of the Interior, the Eastern Band of Cherokee Indians, the Mississippi Band of Choctaw Indians, the Jena Band of Choctaw Indians, the Comanche Nation of Oklahoma, the Cherokee Nation of Oklahoma, the United Keetowah Band of Cherokee Indians, and the Choctaw Nation of Oklahoma. At disposition that same date, the juvenile court found proper ICWA notice had been given to the BIA, Secretary of the Interior, and the Eastern Band of Cherokee Indians. No mention of father's Inuit heritage was made at either the jurisdiction or disposition stages of the hearing. Kyle was removed from parental custody and reunification services were provided to mother and father.

On June 6, 2013, the department filed a "Request for Ex Parte Indian Child Welfare Act Finding" in which it asked that the juvenile court find ICWA did not apply to mother's case "unless further evidence of applicability of the act is later received." The attached social worker's declaration stated that, in compliance with ICWA, a copy of Kyle's petition was received by the BIA and the Eastern Band of Cherokee Indians, and "no determinative evidence has been received within sixty (60) days of proper notice." The declaration further stated that the department would "promptly inform the court if further evidence of the applicability of the act is later received." In response to the ex parte motion, the juvenile court found that proper ICWA notice had been given, that no determinative evidence had been received within 60 days of proper notice, and that Kyle was not subject to ICWA. The finding included the wording that the department "will promptly inform the court if further evidence of the applicability of the act is later received."

At the section 366.26 hearing, which was continued from September 19 to October 14, 2014, mother's counsel stated that she had not been a part of the case at the initial proceedings, but that "mother informed [her] today and received information from

6.

the father today that he is an enrolled member of the Inuit tribe. And [he has] a roll number." County counsel stated that he was aware of that information, but that the juvenile court had already made a determination on June 10, 2013, that ICWA did not apply as to father. And, as explained by county counsel, "[t]he Inuit tribe is a Canadian Indian tribe, not an American Indian or Alaskan Indian tribe, so, therefore, ICWA does not apply." The juvenile court then stated it had already ruled on the issue and that there was "no evidence to establish that [Kyle] is a member or eligible for membership in a tribe that falls within ICWA, therefore, ICWA does not apply."

### B.    ICWA

Congress enacted ICWA to promote the stability and security of Indian tribes and families by establishing minimum standards for removal of Indian children from their families and placement of such children in foster or adoptive homes that will reflect the unique values of Indian culture. (*In re C.Y.* (2012) 208 Cal.App.4th 34, 39; *In re Levi U.* (2000) 78 Cal.App.4th 191, 195.) An "'Indian child' is defined as a child who is either (1) 'a member of an Indian tribe' or (2) 'eligible for membership in an Indian tribe and … the biological child of a member of an Indian tribe .…' (25 U.S.C. § 1903(4).)" (*In re Jonathon S.* (2005) 129 Cal.App.4th 334, 338.) ICWA applies only to federally recognized Indian tribes. (25 U.S.C. § 1903(8); *In re Jonathon S., supra,* at p. 338; *In re B.R.* (2009) 176 Cal.App.4th 773, 783 [federal definition of "'Indian'" includes "Eskimos and other aboriginal peoples of Alaska"; see also 25 U.S.C. § 479]; *In re Wanomi P.* (1989) 216 Cal.App.3d 156, 166-168 [Canadian tribe is not federally recognized tribe under ICWA].)

In state court proceedings involving the foster care placement of, or termination of parental rights to, an Indian child, the Indian custodian of the child and the Indian child's tribe have the right to intervene at any point in the proceeding. (25 U.S.C. § 1911(c).) But this right is meaningless unless the tribe is notified of the proceedings. (*In re Hunter W.* (2011) 200 Cal.App.4th 1454, 1466.) Notice serves the dual purpose of (1) enabling

7.

the tribe to investigate and determine whether a child is an Indian child and (2) advising the tribe of the pending proceeding and its right to intervene. (*In re Desiree F.* (2000) 83 Cal.App.4th 460, 470.)

In every dependency proceeding, the department and the juvenile court have an "affirmative and continuing duty" to "inquire whether a child … is or may be an Indian child .…" (§ 224.3, subd. (a); Cal. Rules of Court, rule 5.481(a); *In re W.B., Jr.* (2012) 55 Cal.4th 30, 53; *In re Gabriel G.* (2012) 206 Cal.App.4th 1160, 1165.) Once the court or department "knows or has reason to know that an Indian child is involved, the social worker … is required to make further inquiry regarding possible Indian status of the child, and to do so as soon as practicable .…" (§ 224.3, subd. (c); Cal. Rules of Court, rule 5.481(a)(4); *Gabriel G., supra,* at p. 1165.) The department's duty of "further inquiry" requires "interviewing the parents, Indian custodian, and extended family members … , contacting the [BIA] … , the tribes and any other person that reasonably can be expected to have information regarding the child's membership status or eligibility." (§ 224.3, subd. (c); Cal. Rules of Court, rule 5.481(a)(4); *Gabriel G., supra,* at p. 1165.)

ICWA applies to children who are eligible to become or who are members of a tribe but does not limit the manner by which membership is to be defined. (*In re Jack C.* (2011) 192 Cal.App.4th 967, 978; see also *Nelson v. Hunter* (Or.App. 1995) 888 P.2d 124, 126, fn. 4 [observing that Congress rejected proposed language that would have limited ICWA protection to enrolled members of Indian tribes].) A "tribe's right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community." (*Santa Clara Pueblo v. Martinez* (1978) 436 U.S. 49, 72, fn. 32.) The tribe's determination that a child is a member of or eligible for membership in the tribe is conclusive. (§ 224.3, subd. (e)(1).)

Issues of law under ICWA are reviewed de novo. (*In re Jack C., supra,* 192 Cal.App.4th at p. 977.) ICWA findings are reviewed for substantial evidence. (*In re*

8.

*D.N.* (2013) 218 Cal.App.4th 1246, 1251 [substantial-evidence test applies to notice findings made under ICWA].)

### C. Analysis

Mother now contends the juvenile court failed to comply with the notice requirements of ICWA by failing to send notice to the relevant Inuit tribe or tribes. We agree.

Department urges that we apply the holding in *In re Pedro N.* (1995) 35 Cal.App.4th 183, 185, 189-190, in which we held that a parent who fails timely to challenge a juvenile court's action regarding ICWA is foreclosed from raising ICWA issues, once the juvenile court's ruling is final, in a subsequent appeal from later proceedings. Here, the juvenile court found at disposition on May 24, 2013, that ICWA notice had been properly given. Mother was entitled to appeal the disposition orders but failed to do so. As such, the juvenile court's dispositional findings and orders are final and no longer subject to attack by mother. (*In re Pedro N., supra,* at pp. 185, 189-190.)

While the proper time to raise the sufficiency of the ICWA notice issue would have been after the disposition hearing, we do not find the spirit of *In re Pedro N.* applicable here, for a number of reasons.

First, at the time of the disposition, the ruling of the juvenile court was that proper notice had been sent to the tribes. At that point, notice had been sent to a number of tribes, but none specifically sent to any "Inuit" tribe, even though father expressed from the very beginning that he had "Inuit heritage, Alaskan Native American." The report prepared in anticipation of disposition stated that father's Indian heritage might include "Inuit." "The burden is on [department] to obtain all possible information about the minor's potential Indian background and provide that information to the relevant tribe or, if the tribe is unknown, to the BIA." (*In re Louis S.* (2004) 117 Cal.App.4th 622, 630; see also *In re C.D.* (2003) 110 Cal.App.4th 214, 226.) Although the department complied with the letter of the law by sending notice to the BIA, it certainly did not

comply with the intent of the law. Notice was sent to the Pacific Regional Office of the BIA (which consists of California tribes) and not the Alaska Regional Office of the BIA, which would have made more sense since father claimed Alaskan Native Heritage. (See <http://www.bia.gov>.) The goal of ICWA is to allow a tribe to intervene in dependency proceedings if it sees fit, but this right is meaningless unless a tribe is notified of the proceedings. (*In re Hunter W., supra,* 200 Cal.App.4th at p. 1466; 25 U.S.C. § 1911(c).)

We next note that the determination of whether or not ICWA applied was not made until a month after disposition, via an ex parte motion, which specifically included the language that the department "will promptly inform the court if further evidence of the applicability of the act is later received." Subsequently, at the section 366.26 termination hearing in October 2014, mother's counsel, who was not appointed counsel at the time of the disposition hearing, questioned the juvenile court on ICWA applicability, stating that mother "received information from the father today that he is an enrolled member of the Inuit tribe. And I have a roll number." County counsel stated she was aware of that information, but that the juvenile court had already made a determination on June 10, 2013, that ICWA did not apply as to father. And, according to county counsel, "[t]he Inuit tribe is a Canadian Indian tribe, not an American Indian or Alaskan Indian tribe, so, therefore, ICWA does not apply." The juvenile court then stated it had already ruled on the issue and that there was "no evidence to establish that [Kyle] is a member or eligible for membership in a tribe that falls within ICWA, therefore, ICWA does not apply."

We find error in the juvenile court's refusal to order further ICWA inquiry and notice. The ex parte motion finding that ICWA did not apply specifically allowed for further inquiry if evidence of applicability were received. Here, mother's counsel stated he had been informed by mother that day that mother had received information from father that he was an enrolled member of the Inuit tribe and that counsel had a "roll

10.

number." If that roll number was for father,[2] it was certainly new evidence of ICWA applicability. Furthermore, we question county counsel's explanation that ICWA did not apply because Inuit is a Canadian Indian tribe, not an American Indian or Alaskan Indian tribe. While a particular Inuit tribe may be Canadian (and therefore ICWA would not apply), it is also possible that the Inuit tribe of which father claimed heritage was American or Alaskan Indian.[3]

Before terminating parental rights to an Indian child, the juvenile court must satisfy ICWA requirements. (*In re Jonathon S., supra,* 129 Cal.App.4th at p. 339.) Here, the Inuit were not properly noticed and afforded an opportunity to intervene. (See 25 U.S.C. § 1912(a); *In re Kahlen W.* (1991) 233 Cal.App.3d 1414, 1425-1426.) We will conditionally reverse and remand for the sole purpose of ensuring ICWA compliance as it relates to father's claim of Inuit heritage.

## II. *Appropriate permanent plan*

Mother also argues that the juvenile court erred when it found the appropriate permanent plan for Kyle was adoption rather than legal guardianship. We disagree.

### A. *Background*

The May 2014 report prepared in anticipation of the 12-month review hearing stated that Kyle was placed with Roger B., mother's brother, in April 2013. An April 2014 adoption assessment found Kyle to be adoptable and his caretakers interested in adopting him. At the review hearing May 22, 2014, the juvenile court terminated mother's reunification services, ordered the county adoption agency to prepare an assessment of the child, and set a section 366.26 review hearing. The juvenile court

---

[2]Earlier information received included an Inuit tribal membership number for father's father.

[3]The American Heritage College Dictionary (3d ed. 2000) sat page 714 defines Inuit as a "member of any of the Eskimo peoples of North America and [especially] of Artic Canada and Greenland."

explained to mother that the purpose of the hearing was to select and implement a permanent plan of adoption, legal guardianship, or long-term foster care for Kyle.

At the September 10, 2014, section 366.26 hearing, mother's counsel requested legal guardianship as the appropriate permanent plan for Kyle. Roger B. testified that he had been in agreement with the recommendation of adoption at the time of the 12-month review hearing, but since then had seen mother undergo "change" in her life that he hoped would allow her to regain custody of Kyle and that guardianship might be more appropriate and in everyone's best interests at that time. Roger B. testified that Kyle had been in his home for a little over a year, that Kyle referred to Roger B. and his wife as "dad" and "mom," and that he loved the child.

According to Roger B., he spoke with a social worker about a month before the current hearing and, at that time, was not sure whether adoption or guardianship would be better because he "did not understand either one of them." He testified that he wished to adopt Kyle if that was his only choice, but he still believed guardianship was "a factor," and he wanted mother to continue to be part of Kyle's life. There was some difference of opinion between county counsel and mother's counsel as to whether the juvenile court was required to put Kyle into a plan of adoption, since he was found to be adoptable, if Roger B. was only interested in guardianship. The juvenile court continued the hearing to allow the parties to brief the issue.

Counsel for Kyle, for mother, and for the department all submitted points and authorities on the issue of the relative-caretaker exception to adoption, section 366.26, subdivision (c)(1)(A). The department also submitted a supplemental social study in which it stated that, on September 26, 2014, Roger B. again reiterated to the social worker that legal guardianship would be best for the entire family, but also expressed concern about the possibility of Kyle's father getting custody and preventing Roger B. and the family from seeing Kyle.

But during a subsequent phone call on October 9, 2014, Roger B. expressed a desire to adopt Kyle, stating that guardianship would have "'negative outcomes,'" and adoption would allow Kyle to be "'taken care of and safe.'" Roger B. told the social worker that mother had two other children she had not made any attempts to care for and that she left all her children for "'either a guy or drugs.'"[4] Roger B. had attended a prospective adoptive parent meeting in early October 2014 in which he heard similar stories to his own. The meeting helped him realize that he would never be able to make either mother or his own mother happy with his decision, but that he would do what was best for Kyle. The department then recommended that Kyle be freed for adoption.

At the subsequent hearing on October 14, 2014, the juvenile court stated that it had received the briefs and undated supplemental report indicating Roger B.'s commitment to adoption. Mother then argued that the beneficial-relationship exception to adoption applied. The juvenile court found that adoption would be in Kyle's best interest and terminated mother's and father's parental rights.

### B.    *Applicable law and analysis*

Once the juvenile court has determined by clear and convincing evidence "that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption." (§ 366.26, subd. (c)(1).) The Legislature has expressed a preference for adoption as the permanent plan when a parent fails to reunify with a child, unless one of several listed exceptions applies. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 826; § 366.26, subd. (c)(1).) One such exception applies when "[t]he child is living with a relative who is unable or unwilling to adopt the child because of circumstances that do not include an unwillingness to accept legal or financial responsibility for the child, but who is willing and capable of providing the child with a stable and permanent

---

[4]Mother has a 15-year-old daughter who lives with the maternal grandmother in Utah and a four-year-old son who lives with his father in Bakersfield.

13.

environment through legal guardianship, and the removal of the child from the custody of his or her relative would be detrimental to the emotional well-being of the child." (§ 366.26, subd. (c)(1)(A).) A parent claiming the exception has the burden of establishing by a preponderance of the evidence that it applies. (*In re Rachel M.* (2003) 113 Cal.App.4th 1289, 1295.)

We review the juvenile court's determination of whether the relative is unable or unwilling to adopt the child under the sufficiency-of-the-evidence standard. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) "'"When the sufficiency of the evidence to support a finding or order is challenged on appeal, the reviewing court must determine if there is any substantial evidence, that is, evidence which is reasonable, credible, and of solid value to support the conclusion of the trier of fact. [Citation.] In making this determination, all conflicts [in the evidence and in reasonable inferences from the evidence] are to be resolved in favor of the prevailing party, and issues of fact and credibility are questions for the trier of fact. [Citation.]"' [Citation.] While substantial evidence may consist of inferences, such inferences must rest on the evidence; inferences that are the result of speculation or conjecture cannot support a finding. [Citation.]" (*In re Precious D.* (2010) 189 Cal.App.4th 1251, 1258-1259.)

In *In re K.H.* (2011) 201 Cal.App.4th 406, on which mother relies, we upheld the juvenile court's order of long-term guardianship on appeal by the department. (*Id.* at p. 419.) However, *K.H.* does not assist mother. *K.H.* states that "[i]t is apparent from the legislative history the Legislature intended that a relative caretaker's preference for legal guardianship over adoption be a sufficient circumstance for application of the relative caregiver exception as long as that preference is not due to an unwillingness to accept legal or financial responsibility for the child." (*Id.* at p. 418.) In that case, the juvenile court determined that the relative-caregiver exception applied where the grandparents "testified they were unwilling to adopt the children because they wanted to remain the children's grandparents. There was also evidence the grandparents were willing to accept

legal and financial responsibility for the children. This evidence was sufficient to satisfy the element of the relative caregiver exception that they be unwilling to adopt because of circumstances that do not include unwillingness to accept legal or financial responsibility." (*Id.* at p. 419.) We find *K.H.* distinguishable because the grandparents in that case consistently and firmly stated that they were unwilling to adopt the minors. The minors in *K.H.* failed to show that substantial evidence did not support the court's determination that the relative-caregiver exception applied. (*Ibid.*)

Here, on the other hand, the juvenile court determined that the relative-caregiver exception did not apply, and the burden on appeal is on mother to show that the relative-caregiver exception does apply. We conclude mother has failed to do so. Roger B. early on indicated his willingness and desire to adopt and, after a brief period in which he expressed a preference for guardianship because he thought it might be in the family's best interests, he again expressed his desire to adopt Kyle. We do not find that Roger B. was "pressured" into agreeing to adoption, as mother suggests. Instead, the evidence before the juvenile court was that Roger B. articulated to the social worker that his reluctance to adopt came from his attempt to try and please both mother and his own mother, but that he knew it was most important to consider what was best for Kyle.

We conclude that substantial evidence supports the juvenile court's determination that the relative-caregiver exception to adoption did not apply, and we reject mother's claim to the contrary.

### *DISPOSITION*

The order terminating mother's parental rights is conditionally reversed and the matter remanded to the juvenile court for the sole purpose of ensuring compliance with ICWA as it relates to father's Inuit heritage. The trial court shall comply with the notice provisions of ICWA. If, after proper notice, the juvenile court determines Kyle is an Indian child, the juvenile court shall proceed pursuant to the terms of ICWA. If the

15.

juvenile court determines ICWA does not apply, the order terminating mother's parental rights shall be reinstated.

_____
Smith, J.

WE CONCUR:


_____
Hill, P.J.


_____
Gomes, J.